Clark *v.* Rosenkrans.

JOHN Y. CLARK, trustee, and others, appellants,

*v.*

ELIJAH ROSENKRANS and others, respondents.

The claim of a wife for money handed over by her to her husband, without any definite agreement between them, at the time, as to its repayment,—*Held,* invalid, under the circumstances, as against her husband's creditors.

Appeal from decree of Sussex orphans court, on exceptions to claim of John Y. Clark, trustee of Emma Cole, against the estate of Jason Cole, her husband, in the hands of John S. Howell, his assignee, under an assignment made under the act "to secure to creditors an equal and just

division of the estates of debtors who convey to assignees for the benefit of creditors."

*Mr. T. Kays,* for appellants.

*Mr. L. Cochran,* for respondents.

THE ORDINARY.

This appeal brings up for review a decision of the orphans court of Sussex county, adverse to the claim of a wife against the estate of her husband in the hands of his assignee, under the assignment act (*Rev. p. 36*), for money which they allege was lent by her to him after the marriage, which took place in 1872. The claim in question is made upon a promissory note given January 16th, 1878, by the husband to John Y. Clark, as trustee for the wife. The note was dated on the day last mentioned, and was payable one day after date, without grace. The purpose in giving it was to secure to the wife a dividend of the estate of the husband, under the assignment which he was then about to make. The estate is largely insolvent without that claim. The alleged debt consisted of two sums of $800 and $1,200 respectively (and interest thereon), which the husband and wife allege were received by the latter after her marriage, from her deceased father's estate, and which they say were handed over by her to her husband, and used by him in his business. The first-mentioned sum ($800) was the amount of a loan made in or about April, 1873, by the mother of the wife, upon the joint and several note of the husband and wife, dated April 30th, 1873, and payable one year after date, with interest. The other sum ($1,200) was received in March, 1876, as part of the consideration ($2,000) of the wife's interest in certain land of which the father died seized. The rest of the consideration was paid by the cancellation of the note for $800. The $1,200 were paid, and the $800 note delivered to the wife, at the time of the delivery of the deed of conveyance for her interest in that

land, and she handed over the note and money to her husband, and he cancelled the former by tearing off the signatures.

No evidence of indebtedness from the husband to the wife was taken at any time, nor was any interest ever paid on the alleged debt, nor any payment made on account of the debt. No payment for principal or interest was ever asked for. When the husband was about to make an assignment for the benefit of his creditors, he, in order to secure to his wife a dividend of his estate, caused the note in question to be drawn by his counsel, and, having previously applied to the person who is named therein as trustee for his wife, and requested him to accept the note and hold it, as trustee, and having obtained his consent, delivered the note to him. He appears to have procured the claim against his estate on the note to be drawn, and, having obtained the trustee's affidavit to it, to have delivered it to the assignee. The proof of the existence of an agreement to repay the $2,000, which it is claimed were lent by the wife to the husband, rests wholly on their testimony.

It was said, in *Post* v. *Stiger, 2 Stew. 554, 556,* that a claim by a wife against her husband, first put in writing when his liabilities begin to jeopardize his future, should always be regarded with watchful suspicion, and when attempted to be asserted against creditors upon the evidence of the parties alone, uncorroborated by other proof, should be rejected at once, unless their statements are so full and convincing as to make the fairness and justness of the claim manifest; and that any other course would encourage fraud, and greatly multiply the hazards of business. As to the $800, the husband testifies that his wife's mother gave his wife her check for $800, and his wife gave him the check, and he drew the money from the bank upon it; but he swears, also, that he, himself, borrowed the money from his mother-in-law, expecting to repay it. So that the $800 were lent to him, and his wife was surety for him, and,

Clark *v.* Rosenkrans.

when her interest in her father's land was sold, she allowed
the $800 on account of the consideration. She thus paid
his debt of $800 for him. When the $1,200 were received
by him, no evidence of indebtedness was given by him to
her. According to his testimony, the circumstances of the
alleged loan were these: When she proposed to sell her
interest in her father's land, he expressed his concurrence,
and said he would borrow the money and use it on his
farm; and, he adds, "That is what we wanted to do, and
she lent me the money, and this was before she sold her
interest." He further says (and she says so, too, substan-
tially), that he told her he did not "want it given to him,"
but that he wanted to borrow the money, and she said all
right. Previously he said, stating the transaction, "She
sold out, and I told her that I would borrow the money."
To the inquiry how he got the $2,000, he replied: "The
$1,200 were in money, and the note (the $800) we had had
and used the money." His reply to the inquiry, when his
wife first asked him for a note, shows clearly that she never
asked him for any at all, and that the subject of payment
to her was only mentioned between them in connection
with his failing circumstances. In reply to that question,
he said that, in the spring of 1877, he told her that if he
could not make any more money than he had the preceding
year, that would be the last year that he would be able to
carry on the business of farming; that she said: "Are you
going to pay me?" He adds, not giving his reply to her
question, "I had had her money, and what I was going to
do was to pay her her money." From the conversations
between him and the person whom he requested to act as
trustee, it is apparent that his proposition to repay the
money, or even to give a note for it, arose from the fact that
he was insolvent, and his property must go to the satisfac-
tion of his creditors. The trustee says that when Cole came
to see him to get him to act as trustee, Cole told him his
circumstances and position, and asked him to act as trustee
for his wife. No consideration passed from the trustee for

the note. The proof in the cause leads to the conclusion that the $800 note was paid by the wife for her husband who had borrowed the money; that the $1,200 were handed over to him by her on no agreement of loan which should be established as against his creditors, and that while there may have been an understanding between them that he would repay her, yet it was not such a definite understanding and agreement as should, under the circumstances, be held to be a contract between husband and wife, as against the creditors of the former.

There is no evidence on which the respondent can be held to be estopped from denying the appellant's claim. Nor could the equity set up against the respondent, in respect to the wife's release of her dower in the farm, if it existed, avail the appellant in this suit. But it does not exist. The wife released her dower under no false representation, or any assurance on the part of the respondent. She appears to have done it to secure a sale of the property. No bidder could be obtained for it without an agreement for such release. With it, it sold for a nominal price only, subject to the mortgage. It would not have brought the amount of the mortgage upon it, on sale under foreclosure.

The decree will be affirmed, with costs.